UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| NOELLE MELISSA CANNON, | ) | |
| | ) | District Court No. 3:15-cv-29 |
| Appellant, | ) | JUDGE CAMPBELL |
| | ) | |
| v. | ) | Bankruptcy Case No. 14-bk-516 |
| | ) | |
| SOUTHEAST FINANCIAL CREDIT UNION, | ) ) | |
| | ) | Adversary Proceeding No. 3:14-ap-90122 |
| Appellee. | ) | (Consolidated with No. 3:14-ap-90155) |

**MEMORANDUM OPINION**

This matter is an appeal from the judgment of the United States Bankruptcy Court of the Middle District of Tennessee Denying Appellant's Request for Attorney Fees Pursuant to 11 U.S.C. § 523(d). For the reasons set forth herein, the Court will affirm the Bankruptcy Court's December 24, 2014 Order Denying Motion for Attorney Fees and Costs.

**I. Factual Background and Procedural History**

On July 15, 2009 Noelle and Greg Cannon, who were married at the time (collectively "the Cannons"), obtained a Home Equity Line of Credit (HELOC) for $84,000 from Southeast Financial Credit Union (Southeast Financial) and a Revolving Credit Deed of Trust in that amount was placed on the Cannons' residence. At the time of closing on the HELOC, the Cannons withdrew $68,000 of the $84,000 line of credit. Although Southeast Financial provided the Cannons with a Visa credit card ending in 0108 ("Card Number 0108") to draw additional funds on the HELOC, the Cannons did not activate the card or make additional draws on the HELOC after the initial withdrawal.

On September 23, 2009, the Cannons refinanced the HELOC and increased the line of credit to $100,000. As part of the refinance, Card Number 0108 was paid off, and Southeast Financial

provided the Cannons with another Visa credit card ending in 0165 ("Card Number 0165") to make additional draws. The $84,000 Deed of Trust was released and a $100,000 Deed of Trust was placed on the Cannons' residence. The Cannons withdrew all $100,000 of the credit at the time of the September 23, 2009 refinance. As the result of a clerical error, Southeast Financial failed to close Card Number 0108 when it opened Card Number 0165.

In January 2010, Mr. Cannon contacted Southeast Financial to ask if Card Number 0108 could still be utilized for home improvements. Southeast Financial's third-party vendor that processed its credit card accounts indicated that it could and activated the card for use. Southeast Financial issued statements to the Cannons and accepted payments from them.

In December 2010, Southeast Financial discovered during a routine audit that the HELOC attached to Card Number 0108 had an outstanding balance when no additional advances should have been made. At Southeast Financial's request, the Cannons executed a third Deed of Trust on January 6, 2011 to secure the outstanding balance. Southeast Financial closed Card Number 0108 and moved the balance to an account that required a monthly principal and interest payment. The Cannons made payments on the Second Deed of Trust attached to Visa Card Number 0165 for forty months and on the Third Deed of Trust for forty-three months. The Cannons stopped making payments on both accounts in March 2013.

In January 2014, Ms. Cannon filed a Chapter 7 bankruptcy. By that time, she was divorced from Greg Cannon, who filed a Chapter 13 bankruptcy on the same day. They both listed debt to Southeast Financial in the amount of $183,160 secured by their residential property. they both also indicated on their respective petitions that they intended to surrender the property.

In April 2014, Southeast Financial initiated an Adversary Proceeding against the Cannons, demanding an order of non-dischargeability against each of them in the amount of $183,160. Both adversary proceedings sought to have the debt declared non-dischargeable for fraud, pursuant to 11 U.S.C. § 523(a)(2)(A). On May 14, 2014, the day after Southeast Financial filed a motion for default judgment against her, Ms. Cannon retained counsel and filed a response to the default motion.

On May 28, 2014, the Honorable Keith Lundin conducted a pre-trial conference to narrow the issues for trial. Ms. Cannon's counsel argued that the complaint lacked any claims for fraud as to the Second Deed of Trust in the amount of $100,000. As a result, Judge Lundin's pretrial order indicated that the amount of debt at issue was $84,000. Bankruptcy Judge Lashburn also held a pretrial conference for Mr. Cannon, and the pretrial order in Mr. Cannon's case also indicated that the amount of debt at issue was the reduced amount of $84,000.

The Bankruptcy Court consolidated the Cannons' cases. At the conclusion of the hearing on the matter on September 25, 2014, the court made oral findings of fact and conclusions of law, concluding that the Cannons' debt to Southeast Financial was dischargeable:

> [I]t does not take an actual misrepresentation to constitute fraud. It's not limited to affirmative statements or even misleading omissions in that there are circumstances where a Debtor intentionally engages in a scheme or some type of conduct to deceive or cheat another party out of property or money that can constitute the type of fraud that fits within 523 (a)(2)(A). And it is a subjective matter standard,. . . and it can be based on circumstantial evidence, based on a debtor's conduct. . . .
>
> So we start, in summary, with the proposition that it's not impossible for this type of conduct to rise to the level of fraud within the meaning of the statute. But it is a heavy burden for the creditor in a case like this to show that that course of conduct rises to that level to meet the preponderance of the evidence. . . .
>
> [T]here is no question that the credit union made a number of mistakes. There's no real dispute. They didn't close the account, Account No. 0108, as they should have. They didn't deactivate the credit card. They sent a statement in October of '09 showing that there was still a credit limit of $84,000 even though it should have been

3

eliminated. They responded to ap hone call and said it's okay to use the credit card. They actually took physical action to activate the credit card. They continued for months sending statements still showing that there was a credit limit every single month for six months or so. It would show how much had been used and the math showed that there was still credit available month after month without it being caught.

So statements were sent, payments were made, payments were accepted by the credit union. In this case, even there were visits to the bank, just to the window apparently, but where payments were made, and they often had to actually look it up to figure out what it was because he didn't have the number, and it still was never discovered month after month.

So the credit union made a series of mistakes over a period of time, eventually more than a year, but the credit was exhausted in about six months.

And by contrast, look at what the Debtor did. Well, first of all, they knew they had refinanced. They knew they had used $100,000 worth of credit. They knew they had borrowed $100,000. The document showed that was the credit limit. The document showed that that had been fully used at closing but then they called the credit union about the credit card. The testimony is that they didn't understand that there was a mistake or an error. They thought they had the credit through some confusion or otherwise and so they used it.

So what did that translate into? Basically, the Debtors arguably should have known. They should have realized that the situation was too good to be true. They should have realized that it didn't really make sense that they still had $84,000 after the refinance. They should have realized that after using up the $100,000 at closing that they didn't still have $84,000 from the prior deal.

So you basically had a should have known type of situation. There's no question that there was no actual misrepresentation; there's no question that there was no actual misleading omission. It's a question of whether these actions by the Debtors could fit into a course of conduct that would be sufficient to call it some type of fraud.

I mentioned one case in particular that was very similar in terms of a home equity line of credit where actions under similar circumstances did meet that test. This is in the *In re: LeVosser* (phonetic) 737 F.3d 814, a First Circuit case. But in that case the facts were a little more egregious because the debtor was a real estate agent that was involved in lots of closings and knew the mortgage market, arguably should have had the expertise to have known much better than the Cannons did that the money wasn't available. It was not taken out in a series of transactions but fairly quickly in lump sums. A variety of circumstances in that case were quite different from this one. But, again, it emphasizes to me that there are cases where it could rise to that level.

4

> But getting back to the question of is the course of conduct here enough to justify a finding of fraud? So, again, we look at those facts in the context of how it looks as a course of conduct regarding intent to deceive. And what you really have to focus on is what happened when they started using the money in February of 2010.
>
> First, they didn't do something to deceive the bank. They simply made a phone call and got an affirmative response that the money was still available and the credit was there. Fairly importantly to me, they both had jobs at the time, based on the testimony. They both had a regular income. Later Mrs. Cannon lost her job. I think there was [sic] some further financial difficulties that occurred within the next year or two but when this all started the testimony is that they were planning to live in the home for a lengthy period of time, that they were primarily going to use the money for home improvements, that they had regular jobs. So fundamentally, there's no indication that they actually didn't honestly believe that they would have the ability to repay it. . . .
>
> In a case like this, the credit union is the one that has the burden of proof and I find that the credit union simply did not prove by a preponderance of the evidence that there was intent to deceive.

Docket No. 3-37 at 3–4, 8–15 (9/25/14 Hearing Transcript). The court incorporated its findings of fact and conclusions of law into its September 29, 2014 written Order Dismissing Adversary Proceedings. Docket No. 2-17.

On December 22, 2014, the Bankruptcy Court conducted a hearing on the Cannons' motion for attorney fees and cost, during which it made the following findings of fact and conclusions of law:

> . . . I looked back at the ruling and even though I found at the time that the lender had not met its burden of proof to prove the fraud, I also gave pretty detailed findings that indicated that there were circumstances that could result in a non-dischargeable finding under these types of situations. In other words, it wasn't a cut and dried ruling. Basically, I just simply don't believe that this case is in the category that Congress was considering when it enacted this statute. Contrary to Debtor's Counsel's position, I think you have to look at the big picture. There's no question that there are some elements of this that are a little bit troubling in terms of the actions of the credit union. In fact, the part that's most troubling is the negligence on the part of the credit union or its servicing agent in not catching the problem and actually exacerbating the problem as it relates to the statements that were sent out showing the credit limit.

5

> But by the same token, you can't get around the fact that the facts in this case did show that the entire credit line was used at the time of the refinancing and the Debtors knew what they were borrowing. They testified and there was no confusion about what they had borrowed. They understood the deal. And, essentially, what they said at some point was that after they saw that the credit card was still available and they checked on it, they decided to use it.
>
> They never said that they actually thought they had borrowed more money than that. They . . . basically, acknowledged, not in so many words, but acknowledged that it seemed too good to be true but after they checked and found that they could still use it, they decided to use it. . . . [U]nder those circumstances, I think that could rise to the level of fraud. The actions of the credit union were such that they contributed to the problem and under the circumstances I couldn't find that they had met the burden of proving non-dischargeability. But I disagree with the idea that these are just honest Debtors that did nothing wrong and that they have somehow been harassed by the credit union. . . .
>
> So I'm going to deny the motion. . . .

Docket No. 3-45 at 13–14 (12/22/14 Hearing Transcript). The court incorporated these findings of fact and conclusions of law into its December 24, 2014 written Order Denying Motion for Attorney Fees and Costs. Docket No. 2-31. This appeal followed.

## II.     Standard of Review

The parties cite Ninth Circuit case law for the proposition that "[a] bankruptcy court's order awarding attorneys fees and costs under § 523(d) is reviewed for abuse of discretion." *In re Montano*, 501 B.R. 96, 105 (B.A.P. 9th Cir. 2013) (citation omitted):

> Under this standard of review, we first "determine *de novo* whether the bankruptcy court identified the correct legal rule to apply to the relief requested.'" *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir.2009) (en banc). And if the bankruptcy court identified the correct legal rule, we then determine under the clearly erroneous standard whether its factual findings and its application of the facts to the relevant law were: "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (internal quotation marks omitted).

*In re Montano*, 501 B.R. at 105 (brackets omitted).

The parties do not identify nor has the Court identified a Sixth Circuit case applying an abuse of discretion standard to the review of a bankruptcy court's order awarding attorneys fees and costs under § 523(d). Accordingly, the Court will apply the usual standard of review utilized in the Sixth Circuit for bankruptcy appeals, which requires this Court to review the bankruptcy court's factual findings for clear error and its conclusions of law *de novo*." *Hills v. McDermott (In re Wicker)*, 702 F.3d 874, 877 (6th Cir.2012). The Court "will not disturb the bankruptcy court's findings of fact unless there is the 'most cogent evidence of mistake of justice.'" *WesBanco Bank of Barnesville, Ohio v. Rafoth (In re Baker & Getty Fin. Servs. Inc.)*, 106 F.3d 1255, 1259 (6th Cir.1997) (quoting *Newton v. Johnson (In re Edward M. Johnson & Assocs., Inc.)*, 845 F.2d 1395, 1401 (6th Cir.1988)). However, the Court's holding in this matter would be the same under either standard of review.

### III. Legal Analysis

Ms. Cannon asserts that pursuant to § 523(d) she is entitled to judgment in her favor for costs and attorney fees sustained in the defense of the part of this action brought under § 523(a)(2). Section 523(d) provides as follows:

> (d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

Congress enacted Section 523(d) "out of concern that creditors were using the threat of litigation to induce consumer debtors to settle for reduced sums, even though the debtors were in many cases entitled to discharge." *In re Martin*, 761 F.2d 1163, 1167–68 (6th Cir. 1985). "The requisite elements of § 523(d) are: (1) a creditor's request for a determination of dischargeability;

7

(2) a consumer debt; (3) the discharge of the consumer debt; and (4) lack of substantial justification." *Matter of Phillips*, 153 B.R. 758, 763 (Bankr. E.D. Mich. 1993).

After reviewing the record, the Court finds no error in the Bankruptcy Court's factual determinations, much less clear error. The Bankruptcy Court's findings of fact were consistent with the evidence before it. Furthermore, upon *de novo* review, this Court agrees with the Bankruptcy Court's legal conclusion that the position of Southeast Financial in seeking to have $84,000 of Ms. Cannon's debt declared to be non-dischargeable was substantially justified. As the excerpt from the Bankruptcy Court's hearing transcript above indicates, the court provided a litany of facts that supported its conclusion that the question of whether these debtors acted with fraud with respect to the $84,000 was a "close call."

Ms. Cannon urges the Court to find that Southeast Financial's legal position was not substantially justified because a senior vice president at Southeast Financial, Chad Bone, indicated in deposition that he did not have proof that the Cannons intended to deceive the credit union. But the Bankruptcy Court was clear that although this case did not involve debtors making affirmative misrepresentations or omissions that demonstrated fraud, their pattern of behavior could potentially have demonstrated fraud and thus rendered their debt non-dischargeable under case law cited by the Court. Mr. Bone's deposition testimony did not preclude the Bankruptcy Court from finding that the Cannons' pattern of conduct was proof of fraud nor render Southeast Financial's position in the adversary proceeding unjustified. Given that the Bankruptcy Court found the question of the Cannons' intent to be a "close call" in light of the pattern of their conduct, it is clear that Southeast Financial's position in this litigation was substantially justified.

Ms. Cannon argues that Southeast Financial's initial request that the $100,000 from the second HELOC be found non-dischargeable was not substantially justified, but the parties easily resolved that matter at the beginning of the litigation at a pretrial conference. That the legal issues to be litigated were clarified and narrowed at the pre-trial conference does not render Southeast Financial's position in the litigation unjustified such that an award of fees is appropriate.

Next, Ms. Cannon argues that the Bankruptcy Court incorrectly placed the burden of proof on her when the court asked her counsel at the beginning of the hearing on fees and costs how this case fits within the statute given the court's prior findings. Asking counsel to articulate the manner in which the applicable statute applies to the issue before the court does not shift the burden of proof.

Last, Ms. Cannon contends that the Bankruptcy Court failed to address special circumstances. The plain language of the statute makes clear that, given the Bankruptcy Court's conclusion that Southeast Financial's position in the adversary proceeding was substantially justified such that an award of fees and costs was not warranted, the court was not required to address the issue of special consequences.

**IV.  Conclusion**

Having reviewed the Bankruptcy Court's factual findings for clear error and legal conclusions *de novo*, the court finds no error. Because the Bankruptcy Court identified the correct legal rule and committed no error in its factual findings or in its application of the facts to the relevant law, the Court's conclusion would be the same under an abuse of discretion standard. Accordingly, the Court will affirm the Bankruptcy Court's December 24, 2014 Order Denying Motion for Attorney Fees and Costs.

An appropriate order is filed herewith.

*Todd Campbell*
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE